Filed 2/21/23  P. v. Alcantar Vazque CA2/6
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|   |   |
|---|---|
| THE PEOPLE,<br><br>   Plaintiff and Respondent,<br><br>v.<br><br>JOSE ALBERTO ALCANTAR VAZQUEZ,<br><br>   Defendant and Appellant. | 2d Crim. No. B302686<br>(Super. Ct. No. CR44630)<br>(Ventura County)<br><br><br>OPINION ON TRANSFER<br>FROM THE SUPREME<br>COURT |

In June 2022 we filed our opinion affirming an order denying appellant's petition for resentencing pursuant to former Penal Code section 1170.95, now section 1172.6.[1]  (*People v. Vazquez* (June 1, 2022, B302686) [nonpub. opn.] (*Vazquez II*).)  In September 2022 the California Supreme Court granted review and transferred the matter back to us "with directions to vacate

---

[1] All undesignated statutory references are to the Penal Code.  Effective June 30, 2022, section 1170.95 was renumbered as section 1172.6 with no change in text.  (Stats. 2022, ch. 58, § 10.)  We will refer to the statute as section 1172.6.

1

[our] decision and reconsider the cause in light of *People v. Strong* (2022) 13 Cal.5th 698 [*Strong*]." We will do so and again deny relief.

In 1999 appellant was convicted of first-degree murder (§§ 187, subd. (a), 189). He was not the actual killer, did not intend to kill, and was not at the scene of the homicide. The jury found true special circumstance allegations that the murder had occurred during the commission of a burglary and an attempted kidnapping (§ 190.2, subds. (a)(17)(B) & (G)). The jury was instructed that it could not find the special circumstance allegations true "unless [it is] satisfied beyond a reasonable doubt" that appellant acted "with reckless indifference to human life and as a major participant" in the commission of the underlying crimes.

In 2019 appellant filed a petition for resentencing under section 1172.6. The court issued an order to show cause. (*Id.*, subd. (c).) After an evidentiary hearing (*id.*, subd. (d)), the trial court concluded that appellant was ineligible for relief. It viewed the evidence in light of the factors set forth in *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*). The trial court found "beyond a reasonable doubt that [appellant] was both a major participant and [had] acted with reckless indifference to human life."[2]

Appellant contends the trial court failed to properly apply the beyond-a-reasonable-doubt standard of proof. The trial court said its task was to "examine[] the evidence to determine if, when viewed *in the light most favorable to the verdict*, each essential element of the crime was proven beyond a reasonable doubt."

---

[2] As appendix A to this opinion, we attach the trial court's written ruling dated October 3, 2019.

(Italics added.)  The trial court misstated its task.  At a section 1172.6 evidentiary hearing, the court should not view the evidence "in the light most favorable to the verdict."  Instead, it should act as an independent factfinder.  Nevertheless, we are satisfied that the trial court fulfilled its role as an independent factfinder in determining that the evidence proved appellant's guilt beyond a reasonable doubt.  Even if it had applied a substantial evidence standard, the error would have been harmless.  We therefore vacate our decision in *Vazquez II* and affirm.

*Facts*[3]

Appellant married Monica Donahoo in June of 1997.  They had dated each other when they were teenagers, but had broken up because their parents disapproved of the relationship.  In the intervening years, Donahoo had been married to a professional gambler.  He died in 1996.  She inherited his house, a large sum of money, and his interest in the Players Club card room, a poker parlor.

After the professional gambler's death and before her marriage to appellant, Donahoo became enamored with Felipe Arambula, the murder victim.  Arambula was married and had three children.  He was a part owner of a Mexican restaurant.  Donahoo often visited the restaurant and brought Arambula gifts.  Arambula instructed his employees not to tell Donahoo that he was married.

---

[3] The relevant facts are taken from our prior unpublished opinion affirming the judgment on direct appeal.  (*People v. Vazquez* (Apr. 24, 2001, B135076) slip opn. at pp. 2-4 (*Vazquez I*).)  In his opening brief's factual summary in the present appeal, appellant states, "The facts of the case are taken verbatim from the unpublished opinion."

In March 1997 Donahoo gave Arambula two cashier's checks, each in the amount of $25,000. Arambula used the funds to purchase a home for his family. Donahoo also gave him a power of attorney to sell an automobile, which he drove for several months and eventually sold for $10,000.

Manuel Vasquez (no relation to appellant) worked at Jiffy Lube and serviced appellant's car in May 1997. During the summer of 1997, Vasquez asked his friend, Erick Gonzalez, to help him kidnap someone. Vasquez told Gonzalez that he had been hired by a person who worked at or owned a card club, and that the intended victim owed that person a lot of money. Vasquez showed Gonzalez a box containing rope, tape, and handcuffs, and said they were going to take the victim to "Jose's" house. Appellant's first name is Jose. Vasquez showed Gonzalez a gun and said "Jose" had given it to him. Gonzalez decided not to participate in the kidnapping.

Vasquez asked another friend, Angel Gutierrez, if he would be interested in helping kidnap somebody. Vasquez said the man who had hired him owned a card room. He took Gutierrez to the house where appellant and Donahoo lived, but appellant was not home. Vasquez also took Gutierrez to the restaurant owned by Arambula and told him the owner was the man he planned to kidnap. Gutierrez declined to participate in the kidnapping.

Vasquez discussed his plan with a third friend, Richard Garcia. Vasquez told Garcia that the owner of the Players Club was going to pay him to do a kidnapping. Vasquez said the owner had given him a gun.

On June 13, 1998, Vasquez spent the afternoon and early evening with Gonzalez, Gutierrez and Garcia. David Hampton was also with the group. Vasquez showed his friends two guns,

4

one of which was a stun gun.  At about 9:00 p.m., Vasquez and Hampton left the group saying they were going to "handle this thing."

Vasquez and Hampton entered Arambula's home at about 9:45 p.m.  They were armed with a nine-millimeter Beretta pistol and a stun gun.  Arambula had not yet returned home.  His wife was putting their children to bed.

Vasquez ordered Arambula's wife to remain in one of the bedrooms and said they would not hurt her.  Vasquez said that Arambula owed $100,000 and that they were there for the money.  Arambula's wife did not see Hampton, but heard someone talking on the phone in another room of the house.

Arambula came home shortly after 10:00 p.m.  He was carrying over $2,000 in cash receipts from his restaurant.  His wife heard a struggle and the buzzing sound of a stun gun, followed by several gunshots.  Arambula was shot six times by a nine-millimeter firearm.  He died from these wounds.

After the shooting, Vasquez and Hampton spoke to Gonzalez, Gutierrez, and Garcia.  They said they had used the stun gun and had tried to grab Arambula, but he had put up a struggle.  Vasquez dropped the nine-millimeter firearm.  Hampton picked it up and shot Arambula.  Vasquez said he had dropped his cellular phone inside Arambula's house.

The police found Vasquez's cellular phone.  It was registered in the name of his mother.  Telephone company records showed that a few minutes before the shooting, several calls had been made from the cellular phone to appellant's residence.  During the previous year, there had also been several calls between the two telephone numbers.

5

After the shooting Vasquez went into hiding. Before he disappeared, he had met briefly with appellant. At the time of appellant's trial, Vasquez had not been apprehended.

A few days after the shooting, Hampton met with his parents and told them what had happened. He showed them a "wad" of cash and said he had been paid $1,000.

Appellant purchased a one-way airline ticket for Hampton to Austin, Texas. He arranged for Hampton to stay there with appellant's friend. While Hampton was in Texas, he and appellant spoke on the telephone several times. Hampton was eventually apprehended.

After the shooting appellant and Donahoo flew to Mexico. Appellant was arrested upon their return in August 1998 and was interviewed by the police. He denied knowing any details about Donahoo's relationship with Arambula, but said he had noticed that she had behaved strangely one day when they went to Arambula's restaurant. Later, a man appellant did not know approached him at a gas station, told him to watch his back, and mentioned the name "Felipe." Appellant wanted to find out what was going on, so he asked Vasquez to contact Arambula and set up a meeting. Appellant claimed he wanted Vasquez to tell Arambula that he wanted to talk to him; he did not want Arambula to be kidnapped or harmed in any way. When appellant learned about what had happened to Arambula, he was frightened. He gave $300 to Hampton and arranged for him to go to a friend's house in Texas.

*Procedural History*

A jury convicted appellant of murder, attempted kidnapping (§§ 664, 207, subd. (a)), burglary (§ 459), assault with a stun gun (§ 244.5, subd. (b)), and false imprisonment by

6

violence (§ 236). The jury found true special circumstance allegations that the murder had occurred during the commission of a burglary and an attempted kidnapping (§ 190.2, subds. (a)(17)(B) & (G)). In addition, the jury found true allegations that appellant had been armed with a firearm and had furnished a firearm to another during the commission of each offense except the assault with a stun gun (§§ 12202, subd. (a)(1)), 12022.4).

The trial court sentenced appellant to life without the possibility of parole plus four years, eight months. We affirmed the judgment on appeal. (*Vazquez I*, *supra* (see *ante*, p. 3, fn. 3.)

Our Supreme Court's decision in *Banks* was issued in 2015. Its decision in *Clark* was issued in 2016. In April 2017 appellant filed a petition for a writ of habeas corpus in the trial court. He alleged that, based on *Banks* and *Clark*, the evidence was insufficient to support the jury's special circumstance findings that he was a major participant in the underlying felonies and had acted with reckless indifference to human life. In May 2017 the trial court denied the petition on the merits. Appellant subsequently filed a habeas petition in this court. We summarily denied the petition.[4]

In 2019 appellant filed a petition for resentencing. (§ 1172.6.) Because the trial judge who sentenced appellant had retired, the matter was assigned to Judge Anthony Sabo. (§ 1172.6, subd. (b)(1).) In the petition appellant reiterated his rejected habeas claim that the evidence was insufficient to support the jury's findings that he was a major participant in the underlying felonies and had acted with reckless indifference to

_____

[4] On our own motion, we take judicial notice of these court records. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

human life.  In opposing the petition, the People argued that the jury's true findings on the special circumstance allegations categorically precluded appellant from obtaining relief.

The trial court ruled that appellant had made a prima facie case for relief.  It issued an order to show cause.  (§ 1172.6, subd. (c).)  The trial court subsequently conducted an evidentiary hearing to determine whether appellant was entitled to relief.  (*Id*., subd. (d).)  Neither side presented new evidence at the hearing.

After the evidentiary hearing, the trial court issued a 7-page ruling.  (Appendix A.)  The trial court stated that it had reviewed the trial transcripts, our opinion affirming the judgment on direct appeal, the probation report, and appellant's habeas corpus petition.  It said its task was to "examine[] the evidence to determine if, when viewed in the light most favorable to the verdict, each essential element of the crime was proven beyond a reasonable doubt."

The trial court made an in-depth analysis of the evidence.  In its conclusion the court wrote: "After examining the evidence submitted by [appellant] and applying the *Banks* factors, the court finds beyond a reasonable doubt that [appellant] was both a major participant and acted with reckless indifference to human life. . . .  [The] Petition for Resentencing pursuant to Penal Code section [1172.6] is denied."

Appellant appealed.  In a majority opinion authored by now retired Justice Perren (Yegan, J., concurring), we affirmed the order denying the petition because "[t]he totality of the considerations supports the jury's finding that appellant was a major participant in the attempted kidnapping and burglary who acted with reckless indifference to human life."  (*Vazquez II*,

8

*supra*, slip opn. at p. 15.) Now retired Justice Tangeman dissented. He concluded that the matter must be remanded for a new evidentiary hearing because the trial court had not acted as an independent factfinder and the jury's special circumstance finding had predated *Banks* and *Clark*.

*Appellant's Contentions*

Appellant contends: "[T]he trial court applied the substantial evidence standard of proof to deny relief after an evidentiary hearing. Specifically, the court concluded that substantial evidence supported the jury's felony murder special circumstances finding made well before . . . *Banks* . . . and . . . *Clark* . . . . Under *Strong*, that was error and requires reversal." "[T]he trial court viewed the evidence in a light most favorable to the prosecution, thereby lessening the prosecution's burden."

In his reply brief appellant cites *Enmund v. Florida* (1982) 458 U.S. 782, for the proposition that he could not be convicted of first degree murder as a matter of law because it is undisputed that he neither committed the homicide, nor was present when the killing took place, nor schemed nor participated in a plot to commit murder. *Enmund* is distinguishable. The issue there was whether the imposition of the death penalty was constitutionally disproportionate under the circumstances, which were completely different from the circumstances here. "[T]he [Supreme] Court found that Enmund's degree of participation in *the murders* was so tangential that it could not be said to justify a sentence of death. It found that neither the deterrent nor the retributive purposes of the death penalty were advanced by imposing the death penalty upon Enmund." (*Tison v. Arizona* (1987) 481 U.S. 137, 148.)

9

Finally, appellant claims "that the trial court erred by relying in part on the probation report following the evidentiary hearing." The claim is forfeited because he did not raise it below. (See *People v. Stitely* (2005) 35 Cal.4th 514, 538.) Moreover, appellant fails to show how the court's consideration of the probation report prejudiced him. "[T]rial [court] error . . . is reversible only if the defendant proves prejudice." (*People v. Perry* (2006) 38 Cal.4th 302, 312.) In a supplemental letter brief filed on April 11, 2022, appellant stated, "While the use of the probation report in and of itself would not require reversal, the combination of relying on the probation report with the application of the incorrect standard of proof does warrant reversal."

## *People v. Strong*

"In Senate Bill No. 1437 (2017–2018 Reg. Sess.) . . . , the Legislature significantly narrowed the scope of the felony-murder rule. [Pursuant to new section 1172.6,] [i]t also created a path to relief for defendants who had previously been convicted of murder on a felony-murder theory but who could not have been convicted under the new law." (*Strong, supra*, 13 Cal.5th at p. 703.)

Appellant was convicted of murder on a felony-murder theory. In *Strong, supra*, 13 Cal.5th at p. 708, our Supreme Court noted: "Penal Code section 189, as amended [by Senate Bill No. 1437], now limits liability under a felony-murder theory principally to 'actual killer[s]' (Pen. Code, § 189, subd. (e)(1)) and those who, 'with the intent to kill,' aid or abet 'the actual killer in the commission of murder in the first degree' (*id.*, subd. (e)(2)). Defendants who were neither actual killers nor acted with the intent to kill can be held liable for murder only if they were

10

'major participant[s] in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of [Penal Code] Section 190.2' — that is, the statute defining the felony-murder special circumstance. (*Id.*, § 189, subd. (e)(3).)"

The Supreme Court continued, "*Banks* and *Clark* both substantially clarified the law governing findings under Penal Code section 190.2, subdivision (d): *Banks* elucidated what it means to be a major participant and, to a lesser extent, what it means to act with reckless indifference to human life, while *Clark* further refined the reckless indifference inquiry." (*Strong, supra*, 13 Cal.5th at pp. 706-707.) Thus, "[f]or petitioners [such as appellant] with pre-*Banks*/*Clark* findings, no judge or jury has ever found the currently required degree of culpability for a first time." (*Id.* at p. 718.)

The Supreme Court held: "[Un]less a defendant was tried after *Banks* was decided [in 2015], a major participant finding will not defeat an otherwise valid prima facie case [under section 1172.6, subdivision (c)]. And unless a defendant was tried after *Clark* was decided [in 2016], a reckless indifference to human life finding will not defeat an otherwise valid prima facie case. [¶] Because Strong's case was tried before both *Banks* and *Clark*, the special circumstance findings do not preclude him from making out a prima facie case for resentencing under section 1172.6." (*Strong, supra*, 13 Cal.5th at p 721.) "This is true even if the trial evidence would have been sufficient to support the findings under *Banks* and *Clark*." (*Id.* at p. 710.)

*Impact of People v. Strong on Section 1172.6(d)(3)*

If a petitioner makes a prima facie showing under section 1172.6, subdivision (c), the court conducts an evidentiary hearing pursuant to section 1172.6, subdivision (d)(3), which provides: "At

11

the hearing to determine whether the petitioner is entitled to relief, the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder . . . ." "A finding that there is substantial evidence to support a conviction for murder . . . is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (*Ibid*.)

Appellant was convicted of felony murder before *Banks* and *Clark* were decided. Therefore, "no judge or jury has ever found the currently required degree of culpability for a first time." (*Strong*, *supra*, 13 Cal.5th at p. 718.) It follows that at the section 1172.6, subdivision (d)(3) evidentiary hearing, the People were required to prove beyond a reasonable doubt that appellant was a major participant in the underlying felony and had acted with reckless indifference to human life. The jury's pre-*Banks*/*Clark* special circumstance findings did not relieve the People of this burden.

*The Trial Court Acted as an Independent Factfinder*

The language of section 1172.6, subdivision (d)(3) requires the trial court to act as an independent factfinder. "This plain language shows the People are required to establish the defendant is guilty under current law *as a matter of fact* and beyond a reasonable doubt." (*People v. Clements* (2022) 75 Cal.App.5th 276, 296.) "[T]he plain text of the statute requires the trial judge to sit as a fact finder, not as a quasi-appellate court." (*Id*. at p. 295.) The People concede that "[a]t a section 1172.6, subdivision (d)(3), evidentiary hearing, the court must act as an independent factfinder . . . ."

Instead of acting as an independent factfinder, the trial court here arguably applied the substantial evidence rule.

12

Pursuant to this rule, in determining the sufficiency of the evidence "both trial and appellate courts must review 'the whole record *in the light most favorable to the judgment*' and decide 'whether it discloses substantial evidence . . . such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Hatch* (2000) 22 Cal.4th 260, 272, italics added.) The trial court said its task was to "examine[] the evidence to determine if, when viewed *in the light most favorable to the verdict*, each essential element of the crime was proven beyond a reasonable doubt." (Italics added.) The court noted, "This same standard also applies to challenges to the evidence where a special circumstance is found to be true. *People v. Edwards* (2013) 57 Cal.4th 658, 715." At page 715 *Edwards* sets forth the substantial evidence standard of review. In accordance with that standard of review, the trial court observed: "It was reasonable for the jury to conclude that [appellant] was aware of what was taking place and the possible consequences of the crime with the supplied weapons." "The jury could have logically concluded that [appellant] was being informed of exactly what was taking place in the home as the attempted kidnapping was taking place and when the murder occurred."

"The trial court's use of an unsound course of reasoning is immaterial if the action ultimately taken . . . was proper. [Citation.]" (*People v. Patton* (1976) 63 Cal.App.3d 211, 219.) Here, the action ultimately taken by the trial court was proper. When it ruled on appellant's petition, the court fulfilled its responsibility to act as an independent factfinder and determine whether the evidence established appellant's guilt beyond a reasonable doubt. The court said, "After examining the evidence submitted by [appellant] and applying the *Banks* factors, *the*

13

*court finds beyond a reasonable doubt* that [appellant] was both a major participant and acted with reckless indifference to human life." (Italics added; see Appendix A, p. 6, "Conclusion.")

But in an abundance of caution, we show below that even if the trial court had applied an incorrect standard of proof, the error would have been harmless. In our discussion below, we assume for purposes of analysis only that the trial court did not act as an independent factfinder.

### Any Assumed Error Is Subject to Review
### Under the Watson Harmless Error Test

"[S]ection [1172.6] is an act of legislative lenity in that a defendant who qualifies for [post-sentencing] relief [under the statute] may receive a decreased punishment." (*People v. Myles* (2021) 69 Cal.App.5th 688, 703.) It "is purely a creature of state statutory law." (*People v. Epps* (2001) 25 Cal.4th 19, 29.) "Typically, when an 'error is purely one of state law, the *Watson* harmless error test applies.'" (*People v. Lewis* (2021) 11 Cal.5th 952, 973; see *People v. Watson* (1956) 46 Cal.2d 818.) "Under the *Watson* test, we deem an error harmless unless it is 'reasonably probable' the outcome would have been different in the absence of the [assumed] error." (*People v. Hendrix* (2022) 13 Cal.5th 933, 942.)

### Harmless Error: Major Participant Issue

In *Banks* the Supreme Court identified factors that "may play a role in determining whether" a defendant was a major participant in criminal activity. (*Banks, supra*, 61 Cal.4th at p. 803.) "Among those factors . . . are these: What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the

14

defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Ibid*.)

Assuming the trial court had not acted as an independent factfinder, it is not reasonably probable the outcome would have been different as to the "major participant" issue had the court acted as an independent factfinder. Appellant was the "mastermind" of the attempted kidnapping. He hired Vasquez and Hampton to kidnap the victim. The trial court noted that appellant had supplied the murder "weapon and a stun gun to Vasquez in preparation for the kidnapping." Appellant had "also supplied his accomplices with ammunition, . . . rope, tape, and gloves."

Although appellant was not physically present at the scene of the killing, cell phone records show that he was in contact with Vasquez during the commission of the crimes. The trial court stated: "[T]he evidence shows that [appellant] was in direct contact with Vasquez virtually from the moment Vasquez and Hampton entered the home until just before the two men fled after the murder. . . . With near continuous communication taking place between the armed hired kidnappers and

15

[appellant], [appellant], from his remote location, could have either facilitated or prevented the murder by giving directions to his confederates."

The trial court continued: "[B]ut for [appellant's] involvement there is no reason to believe any crime would have been committed." Appellant's "actions make him both the catalyst for the crime as well as the leader of it and therefore a major participant. . . . Following the killing, the record indicates that Vasquez and Hampton were paid at least $1,000 each . . . ." Appellant "facilitated Hampton in fleeing to the state of Texas with a plane ticket, money, and a place to stay."

*Harmless Error: Reckless Indifference Issue*

"Reckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved a grave risk of death.""" (*Banks, supra,* 61 Cal.4th at p. 807.) "The mere fact of a defendant's awareness that a gun will be used in the felony is not sufficient to establish reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at p. 618.)

"Reckless indifference to human life has a subjective and an objective element. [Citation.] As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.] As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.""" (*In re Scoggins* (2020) 9 Cal.5th 667, 677.)

16

In *Clark* our Supreme Court set forth several factors that may be relevant in determining whether the defendant acted with reckless indifference to human life. The first factor is the defendant's awareness that a firearm would be used, whether the defendant used a firearm, and the number of firearms involved. (*Clark, supra*, 63 Cal.4th at p. 618.) Appellant knew that a firearm would be used. He provided the firearm and ammunition to Vasquez and Hampton.

The second factor is the defendant's "physical presence at the crime and opportunities to restrain the crime and/or aid the victim." (*Clark, supra*, 63 Cal.4th at p. 619, italics and capitalization omitted.) Although appellant was not physically present at the scene of the crime, he was in continuous contact with the perpetrators and could have restrained them. They were acting on his behalf and under his direction. After the victim was shot, appellant made no attempt to aid him.

The third factor is the "duration of the felony." (*Clark, supra*, 63 Cal.4th at p. 620, italics and capitalization omitted.) "Where a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation], possibly culminating in murder. The duration of the interaction between victims and perpetrators is therefore one consideration in assessing whether a defendant was recklessly indifferent to human life." (*Ibid*.) Here, the intended crime – kidnapping – involved movement of the victim at gunpoint and a prolonged period of restraint.

The fourth factor is the "defendant's knowledge of factors bearing on a cohort's likelihood of killing . . . ." (*Clark, supra*, 63 Cal.4th at p. 621.) The trial court stated: "There is no evidence

17

that either Vasquez or Hampton had any experience in crimes of violence. . . . [Appellant] appears to have hired the first two people who were willing to commit the crime for him . . . . [T]hey were unsophisticated criminals sent to a larger person's home to commit a crime of violence with a weapon provided by [appellant]. It should have been reasonable for [appellant] to expect that under those circumstances his criminal employees would be in a position to use those weapons more recklessly and more quickly than someone with more criminal experience." The trial court noted that appellant had told the police that "the victim was a big man who might want to fight."

The fifth factor is the "defendant's efforts to minimize the risks of the violence during the felony." (*Clark*, *supra*, 63 Cal.4th at p. 621, italics and capitalization omitted.) Appellant took no measures to minimize the risks of violence. He planned and supervised the commission of a crime with a high risk of lethal violence: an armed home-invasion kidnapping while the victim's wife and children were inside the home. "[Appellant] had to be aware of the risk of resistance to such an armed invasion of the home and the extreme likelihood death could result." (*People v. Mora* (1995) 39 Cal.App.4th 607, 617.) The trial court observed: "[Appellant] was aware that the victim was married and should have reasonably assumed that his wife would be home at the time of the break in."

Thus, assuming the trial court had not acted as an independent factfinder, it is not reasonably probable the outcome would have been different as to the "reckless indifference" issue had the court acted as an independent factfinder. The trial court would have found beyond a reasonable doubt that appellant was ""*subjectively* aware that his . . . participation in the felony

involved a grave risk of death.'"'" (*Banks, supra,* 61 Cal.4th at p. 807.)

### Disposition

Our decision in *Vazquez II* is vacated.  The order denying appellant's section 1172.6 petition for resentencing is affirmed.

NOT TO BE PUBLISHED.

YEGAN, J.

I concur:

GILBERT, P. J.

GILBERT, P. J., Concurring.

I concur because it appears the trial court applied the *Banks-Clark* factors in arriving at its decision beyond a reasonable doubt.

NOT TO BE PUBLISHED.

GILBERT, P. J.

BALTODANO, J., Dissenting.

I respectfully dissent. The order denying the Penal Code[1] section 1172.6 petition should be reversed and remanded for a new evidentiary hearing.

In examining the evidence "in the light most favorable to the verdict," the trial court improperly applied a sufficiency of the evidence standard at the evidentiary hearing and did not independently weigh the facts. "[A] fact finder tasked with holding the People to the beyond a reasonable doubt standard, 'must impartially compare and consider all the evidence that was received throughout the entire trial' and determine whether that 'proof . . . leaves you with an abiding conviction that the charge is true.' [Citations.]" (*People v. Clements* (2022) 75 Cal.App.5th 294-295.) Only after "the trial court sits as a trier of fact" (*People v. Schell* (2022) 84 Cal.App.5th 437, 442) and makes an independent finding of facts beyond a reasonable doubt, can we meaningfully review whether there is substantial evidence to support the trial court's factual findings. (*Clements, supra,* at pp. 295, 298.)

The trial court applied a substantial evidence standard when it based its ruling on what "was reasonable for the jury to conclude" and what the jury "could have logically concluded." It did not mention the defense's evidence or theory of the case, much less independently weigh the evidence. Because the trial court did not engage in this comparative analysis, its finding regarding reckless indifference to human life falls short of the evidentiary support required by section 1172.6, subdivision (d)(3).

In its minute order denying the resentencing petition, the trial court cited *People v. Banks* (2015) 61 Cal.4th 788, but did

---

[1] Undesignated statutory references are to the Penal Code.

1

not cite *People v. Clark* (2016) 63 Cal.4th 522, or its factors. *Banks*, at page 803, lists factors for the "major participant" element. (See *Clark*, at p. 611.) *Clark* lists factors for "reckless indifference to human life." (*Id.*, at pp. 618-622.) " '[W]hether a category of crimes is sufficiently dangerous to warrant felony-murder treatment, and whether an individual participant has acted with reckless indifference to human life, are different inquiries.' " (*Id.*, at p. 616.) The trial court here confused the two elements, erroneously stating, "[t]he *Banks* decision . . . listed factors it considered in determining if a defendant acted with reckless indifference." The court then listed and analyzed the *Banks* factors and concluded they established reckless indifference, without ever referring to the *Clark* factors. Because the trial court did not analyze the *Clark* factors, it could not have made the independent factual finding that appellant acted with reckless indifference to human life.

These errors are not harmless under *People v. Watson* (1956) 46 Cal.2d 818 because there is " 'more than an *abstract possibility*' " the trier of fact might find a reasonable doubt as to this element if it independently weighed the evidence. (*People v. Hardy* (2021) 65 Cal.App.5th 312, 329–330.) A " 'reasonable probability' " " 'does not mean "more likely than not," but merely a "probability sufficient to undermine confidence in the outcome." ' " (*Ibid.*) Given the trial court's incorrect application of the standard of proof at the evidentiary hearing and its failure to apply the *Clark* factors, there has not been a finding beyond a

2

reasonable doubt by either the jury or the trial court that appellant acted with reckless indifference to human life as defined by *Clark*.

NOT TO BE PUBLISHED.

BALTODANO, J.

# APPENDIX A

VENTURA
SUPERIOR COURT 00258
FILED

OCT 03 2019

MICHAEL D. PLANET
BY: _____ , Deputy

SUPERIOR COURT OF CALIFORNIA, COUNTY OF VENTURA

JUDGE:     ANTHONY J. SABO       DATE: October 3, 2019

CLERK:     C. NESBITT       CASE NO.: CR44630B

TITLE OF CASE:     PEOPLE v. JOSE ALBERTO ALCANTAR VAZQUEZ

---

**NATURE OF PROCEEDINGS:**     **RULING ON PETITIONER, JOSE ALBERTO ALCANTAR VAZQUEZ'S, APPLICATION TO BE RESENTENCED UNDER SENATE BILL 1437 AND PENAL CODE SECTION 1170.95.**

**PROCEDURAL HISTORY:**

The petitioner, Jose Alberto Alcantar Vazquez, was convicted by a jury on July 29, 1999, of first degree murder, attempted kidnapping, residential burglary, assault with a stun gun, and false imprisonment. The jury further found true the special circumstance allegations that the murder was committed during the course of the attempted kidnapping and during the commission of the residential burglary. As to the attempted kidnapping, residential burglary, and false imprisonment counts, the jury also found true that the petitioner was in possession of a firearm and that he furnished a firearm to another to aid in the commission of each offense. On August 31, 1999, the petitioner was sentenced to life without the possibility of parole plus 4 years and 8 months.

On January 7, 2019, the petitioner filed a Petition for Resentencing pursuant to Penal Code section 1170.95/Senate Bill 1437. On April 26, 2019, counsel for the People and for the petitioner appeared to address the request for relief. After argument, the matter was submitted on the moving papers. On July 19, 2019, this court issued an Order to Show Cause ("OSC") and set the matter for hearing on September 6, 2019. At the OSC, counsel for the People, counsel for the petitioner, and the petitioner appeared. Following argument, the matter was submitted.

In addition to hearing the OSC, the court also heard and took under submission the People's constitutional challenge to SB 1437 and the petitioner's response. That issue was also taken under submission.

**STATEMENT OF FACTS:**

In reviewing the facts of this case, this court examined trial transcripts, the probation report, the opinion of the Second Appellate District, Division Six, and the Habeas Corpus petition. The basic facts are as follows.

The petitioner was found guilty of first degree murder with true findings for the special circumstances of attempted kidnapping and burglary. The victim, Felipe Arambula, was killed in his home on the night of June 13, 1998. Two individuals, Manuel Vasquez ("Vasquez") (no familial relationship to the petitioner) and David

Hampton ("Hampton"), had broken into his house to await his arrival. The plan was to take the victim by force, if necessary, to the petitioner. The record indicates the petitioner believed that the victim owed the petitioner's wife $50,000 in cash and $10,000 for a car she had previously given the victim. At approximately 10:00 p.m., the victim returned from work and was immediately attacked by Vasquez and Hampton. A struggle between the three men ensued and the victim was shot six times and stunned by the stun gun two times. The two subjects fled and police arrived in less than five minutes. The victim died at the scene.

## Penal Code section 189(e)/Senate Bill 1437:

The petitioner files his motion for relief of the verdicts in this case pursuant to SB 1437. The newly amended version of Penal Code section 189, subdivision (e) provides as follows:

"(e)    A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) [first degree felony murder] in which a death occurs is liable for murder only if one of the following is proven:

(1)    The person was the actual killer.

(2)    The person was not the actual killer, but, with intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree.

(3)    The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2.

(f)    Subdivision (e) does not apply to a defendant when the victim is a peace officer who was killed while in the course of his or her duties, where the defendant knew or reasonably should have known that the victim was a peace officer engaged in the performance of his or her duties."

Subdivision (a) of Penal Code section 189 lists felonies which are referred to in Penal Code section 189(e) above. That list includes the crimes of attempted kidnapping and burglary, both offenses found true by the jury with respect to Count 1, murder in the first degree.

Also referenced above in the amended language of Penal Code section 189(e) is the definition of "reckless indifference to human life" described in Penal Code section 190.2(d). This section states that:

". . . . every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) [which includes the crimes of attempted commission of kidnapping and burglary] which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4."

In examining Penal Code section 189(e) as it applies to facts of this case, it is clear that the petitioner would not be liable for felony murder under section (1), (2), or the peace officer portion of (3). The focus of the petitioner's request for relief centers on Penal Code section 189(e)(3); was he a major participant in the underlying felony acting with reckless indifference to human life.

2
MINUTE ORDER

3

As a preliminary matter, the court must also examine the petitioner's conviction to determine if, as required in Penal Code section 190.2(d), a special circumstance enumerated in paragraph (17) of subdivision (a) was found true as required by Penal Code section 190.4. The jury in this case found two special circumstances in Count 1, murder in the first degree: that the petitioner (1) was engaged in the commission of attempted kidnapping; and (2) that the petitioner was engaged in the commission of burglary. An examination of the jury instructions read and provided to the jury indicates that the jury was told that if they found the defendant (petitioner) guilty as to Count 1, they would then need to examine the two special circumstances. CALJIC instructions 8.80.1, 8.81.17, 8.83.1, 8.83.2, and 8.83.3 on special circumstances were given and the jury did find both true.

## APPLICATION:

In deciding on this petition, the court examines the evidence to determine if, when viewed in the light most favorable to the verdict, each essential element of the crime was proven beyond a reasonable doubt. This same standard also applies to challenges to the evidence where a special circumstance is found to be true. *People v. Edwards* (2013) 57 Cal.4th 658, 715.

### A. Was the Petitioner a Major Participant in the Murder?

The first of the two prongs of Penal Code section 189(e)(3) is a determination of whether the petitioner's involvement in the crime rises to the level of being a major participant. The evidence in the record indicates that the petitioner was a major participant in this offense. While not physically present at the killing, but for his involvement there is no reason to believe any crime would have been committed. Many of the same facts discussed below under reckless indifference to human life support this conclusion. The court therefore finds that the petitioner was in fact a major participant in the killing of the victim.

### B. Did the Petitioner Act With Reckless Indifference to Human Life?

Penal Code section 189(e) refers to Penal Code section 190.2(d) for a definition of reckless indifference to human life. The court looks to *People v. Banks* (2015) 61 Cal.4th 788 for guidance. *Banks*, citing *Enmund v. Florida* (1982) 458 U.S. 782 and *Tison v. Arizona* (1987) 481 U.S. 137, discusses a spectrum of the range of reckless indifference. In *Enmund*, the defendant was the getaway driver and as such found not to have acted with reckless indifference. In *Tison*, the defendant was found to have knowingly engaged in conduct known to carry a grave risk of death. The *Banks* decision found the named defendant fell on the *Enmund* end of the spectrum and listed factors it considered in determining if a defendant acted with reckless indifference. Those factors are:

1. What role did the petitioner have in planning the criminal enterprise that led to the death?

2. What role did the petitioner have in supplying or using lethal weapons?

3. What awareness did the petitioner have of the particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of other participants?

4. Was the petitioner present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his own actions or inactions play a particular role in the death?

3
MINUTE ORDER

4

00261

5.     What did the petitioner do after lethal force was used?

## 1.     Role of the Petitioner in Planning.

In June, 1997, the petitioner married his wife Monica. Monica had previously been in a relationship with the victim, Felipe Arambula, who was married to Yazmin. The victim and his wife had two children. During the course of their relationship, the victim kept his marital status hidden from Monica. Monica, whose first husband, Henry, had recently died, gave the victim two cashier's checks for $25,000 each and a car which the victim ultimately sold for $10,000. After marrying the petitioner, Monica was depressed and angry about the money and car she had given the victim. The petitioner recognized she was upset for having been taken advantage of by a married man and took it upon himself to address the financial loss.

The petitioner decided to get the money back for his new wife. Because the victim was a large man, he attempted to enlist the help of a number of individuals to bring the victim to him (the basis of the attempted kidnapping). Two of those people were Manuel Vasquez and David Hampton, both of whom worked at a card club in Ventura that was owned by Monica, the petitioner's wife. Phone records indicate that between July 14, 1997 and August 3, 1997, the petitioner called Vasquez 7 times. Vasquez called the petitioner one time during that same time span. Following those conversations, Vasquez hired Hampton to assist in the kidnapping. The record indicates the petitioner knew that Hampton had been recruited by Vasquez. Vasquez and Hampton then told their mutual friends, Eric Gonzalez ("Gonzalez"), Angel Gutierrez ("Gutierrez") and Richard Garcia ("Garcia"), about being offered money by the man that owned the card club (the club was actually owned by the petitioner's wife) and drove a black Mercedes to kidnap the victim.

In the spring of 1998, the petitioner, who at the time was driving a black Mercedes, was introduced to one of the friends, Gonzalez, by Vasquez. The petitioner asked Gonzalez where he could buy some guns. Gonzalez offered to help. At some point later, Vasquez showed Gonzalez a gun he said he had obtained from the petitioner. Vasquez also introduced one of the other friends, Gutierrez, to the petitioner and his wife Monica. Gutierrez was introduced to the petitioner as someone who he (Vasquez) had tried to hire to help with the kidnapping.

In April, 1998, Vasquez called the petitioner 7 times. He also called Hampton 3 times in May, 1998. The petitioner called Vasquez twice in late April, 1998, and then Vazquez called Hampton 3 times in May, 1998. The calls between the three continued into June, 1998, with Vasquez calling the petitioner 5 times and calling Hampton 6 times. During the first week of June, 1998, in the midst of the phone calls, Vasquez went to Gutierrez's house and showed him a black 9mm Beretta handgun he had gotten from the petitioner for the kidnapping.

Then came the fatal day of June 13, 1998. That afternoon, Vazquez, Hampton, Garcia, and Gonzalez rode around the city of Santa Paula. At approximately 4:00 p.m., Vasquez called the petitioner. At around 9:00 p.m., Vasquez and Hampton told the others they were going to do the kidnapping that night and they passed a gun and a stun gun around while discussing the plan. As the group split up, Vasquez and Hampton said, "We'll be back; we're going to handle this thing."

Under the factors outline in *People v. Banks* (2105) 61 Cal.4th 788, the petitioner's actions make him both the catalyst for the crime as well as the leader of it and therefore a major participant. The plan to kidnap the victim began in July, 1997, and continued up until the very day of the murder. From the telephone records it is clear that the major players were in constant communication. Evidence from the friends corroborates much of their

4
MINUTE ORDER

5

accounts. Following the killing, the record indicates that Vasquez and Hampton were paid at least $1,000 each to participate. Not only did the petitioner supply the gun, but from the record he also supplied his accomplices with ammunition, a stun gun, rope, tape, and gloves.

**2.     What Role Did the Petitioner Have in Supplying a Lethal Weapon?**

The victim was shot 6 times. At the scene, police officers recovered 8 9mm shell casings and 8 9mm bullets, one from inside the victim's body. All 8 bullets were fired from the same weapon. In addition to the gunshot wounds, the victim had two wounds on his back from a stun gun. The fact that the victim was shot with 9mm ammunition and stunned twice is consistent with the evidence presented to the jury that the petitioner had supplied the same caliber weapon and a stun gun to Vasquez in preparation for the kidnapping.

**3.     What Awareness Did the Petitioner Have of the Particular Dangers Posed by the Nature of the Crime, Weapons Used, or Past Experience or Conduct of Other Participants?**

The petitioner told investigators he wanted to talk to the victim. He hired Vasquez, who, in turn, enlisted the help of Hampton. Both were paid by the petitioner for their participation. They told their mutual friends, Gutierrez, Garcia and Gonzalez, about the kidnapping plan. Attempted kidnapping and burglary are specific crimes listed as special circumstances in Penal Code section 190.2. They are on this list because of the special danger they pose. The two men went to the victim's home. The petitioner was aware that the victim was married and should have reasonably assumed that his wife would be home at the time of the break in. Additionally, the petitioner supplied the pair with a gun and a stun gun as well as gloves, rope, and tape. It was reasonable for the jury to conclude that the petitioner was aware of what was taking place and the possible consequences of the crime with the supplied weapons.

The record indicates that the petitioner was physically intimidated by the victim. There is no evidence that either Vasquez or Hampton had any experience in crimes of violence. In discussing the case with his parents, Hampton told them that when the victim got home he "went ballistic" and "just went ape" on them. The petitioner appears to have hired the first two people who were willing to commit the crime for him, neither with any experience. Contrary to the argument that they were unsophisticated criminals, weighing in the petitioner's favor is the argument they were unsophisticated criminals sent to a larger person's home to commit a crime of violence with a weapon provided by the petitioner. It should have been reasonable for the petitioner to expect that under those circumstances his criminal employees would be in a position to use those weapons more recklessly and more quickly than someone with more criminal experience.

**4.     Was the Petitioner Present at the Scene of the Killing, in a Position to Facilitate or Prevent the Actual Murder, and Did his Own Actions or Inactions Play a Particular Role in the Death?**

Found at the scene was a cell phone that was registered to Veronica Lazos, the mother of Vasquez. Evidence was presented that others in her family, including Vasquez, had use of the phone. On June 13, 1998, Ms. Lazos noticed that the phone was missing. Cell phone records showed that Vasquez made three calls to the petitioner's cell phone on the night of the murder. The first was at 9:53 p.m. for 54 seconds; the second at 9:54 p.m. for 6 minutes and 7 seconds; and the third at 10:01 p.m. for 44 seconds. The record indicates that Vasquez and Hampton entered the victim's home through an unlocked window at approximately 9:45 p.m. According to testimony from neighbors, the victim arrived home shortly after 10:00 p.m. Police and EMTs were on the scene by 10:14 p.m. in response to a 911 call from the victim's wife.

The petitioner was not present during the murder. However, the evidence shows that the petitioner was in direct contact with Vasquez virtually from the moment Vasquez and Hampton entered the home until just before the two men fled after the murder. The jury could have logically concluded that the petitioner was being informed of exactly what was taking place in the home as the attempted kidnapping was taking place and when the murder occurred. The victim's wife and child were moved into a bedroom and told to remain there and that they would not be hurt. While Hampton guarded them and prevented their use of a phone, Vasquez was heard by the victim's wife talking to someone. The victim was heard arriving home and was attacked immediately upon entry. With near continuous communication taking place between the armed hired kidnappers and the petitioner, the petitioner, from his remote location, could have either facilitated or prevented the murder by giving directions to his confederates.

### 5.    What Did the Petitioner Do After Lethal Force was Used?

Vasquez was interviewed by detectives on July 7, 1998. Following the interview, he was released and disappeared. He remains at large to this day. Before vanishing, Vasquez met with the petitioner at a restaurant in Ventura.

The petitioner called a friend in Texas and told him that he was going to send Hampton to stay with him. On June 25, 1998, the petitioner bought two round trip tickets for he and his wife to Mexico and a one way ticket to San Antonio for Hampton. Hampton's ticket was paid for in cash. During his first week in Texas, Hampton and the petitioner spoke on the phone on two occasions. The petitioner and his wife returned from Mexico approximately one month after their originally scheduled return and were arrested. A search warrant was executed on petitioner's home and phone numbers for the victim, Gonzalez, and Gutierrez were found.

The petitioner was interviewed by detectives and that interview was played for the jury at trial. He denied any knowledge of the victim's existence until about a month before the murder. The petitioner claimed that he had been at the victim's restaurant approximately 4 weeks before the shooting and noticed that his wife was nervous around the victim. According to the petitioner, he wanted to talk to the victim but somewhere public because he was afraid the victim would kill him. He said the victim was a big man who might want to fight so he asked Vasquez to tell the victim that he want to talk to him (victim).

The petitioner admitted that on the night of the shooting he received one call from Vasquez. Vasquez told him about the shooting. The petitioner denied knowing Gonzalez and Garcia. He said he never met Hampton until he drove him to the airport. He admitted giving Hampton $300 and calling his friend in Texas to see if Hampton had arrived.

The evidence shows that the petitioner had prior contacts with Vasquez and Hampton before the murder. It further shows that the petitioner met with Vasquez just prior to his disappearance for more than the past 20 years, and that he facilitated Hampton in fleeing to the state of Texas with a plane ticket, money, and a place to stay.

### CONCLUSION

After examining the evidence submitted by the petitioner and applying the *Banks* factors, the court finds beyond a reasonable doubt that the petitioner was both a major participant and acted with reckless indifference to human life. The court finds that the petitioner aided, abetted, counseled, commanded, induced, and solicited in the commission of attempted kidnapping and burglary. The petitioner's Petition for Resentencing pursuant to

00264

Penal Code section 1170.95/Senate Bill 1437 is denied. Because the court finds that the petitioner is not entitled to relief, it makes no ruling on the constitutional argument. The petitioner is remanded to the California Department of Corrections as previously sentenced.

Dated: October 3rd, 2019

ANTHONY J. SABO
JUDGE OF THE SUPERIOR COURT

7
MINUTE ORDER

8

Anthony J. Sabo, Judge

Superior Court County of Ventura

_____

Todd W. Howeth, Claudia Y. Bautista, Public Defenders, William Quest, Snr. Deputy Public Defender.

Rob Bonta, Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Charles S. Lee, Colleen M. Tiedemann, Daniel Chang, Deputy Attorneys General, for Plaintiff and Respondent.